# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1836

_____

Reuben J. Garcia

*Plaintiff - Appellant*

v.

City of New Hope; Officer Anthony Gust, all in their individual and official capacities; Officer Kaitlyn Baker, all in their individual and official capacities; Officer Nadine Jacobs, all in their individual and official capacities; Officer Adam Johnson, all in their individual and official capacities

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: May 13, 2020
Filed: January 5, 2021

_____

Before SMITH, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.

_____

SMITH, Chief Judge.

Officer Kaitlyn Baker conducted a traffic stop of Reuben J. Garcia's vehicle after he extended his middle finger at her as he drove past her. Officers Anthony Gust, Nadine Jacobs, and Adam Johnson later arrived at the stop to assist Officer

Baker. Garcia refused to provide his license, and the officers handcuffed and detained him for a short period of time. Officer Baker then issued Garcia a citation and allowed him to leave.

Garcia later sued the officers and the City of New Hope ("City") under 42 U.S.C. § 1983, claiming violations of his First and Fourth Amendment rights. The district court granted summary judgment to the officers and the City, finding that the officers were entitled to qualified immunity because Officer Baker had probable cause to conduct a traffic stop of Garcia's vehicle, the officers did not use excessive force during the stop, and Officer Baker did not retaliate against Garcia for exercising his First Amendment rights. Garcia appeals. We affirm in part and reverse in part.

I. *Background*

On February 1, 2016, Officer Baker was on school patrol at Sonnesyn Elementary in New Hope, Minnesota. That morning, Garcia drove by the school and saw Officer Baker motion for him to stop his vehicle. He stopped. Officer Baker shouted for him to slow down, but Garcia responded that he was going the speed limit. Garcia then drove away. Officer Baker did not issue Garcia a citation.

Later, in the afternoon, Garcia again saw Officer Baker at the school. This time, he extended his hand out of his car window and raised his middle finger at Officer Baker as he drove past her. In response to Garcia's action, Officer Baker decided to follow Garcia in her squad car. She activated her video camera. As she followed him, the camera recorded her stating the "driver drove by flipping [her] off . . . . arguing about speed when the children were out during the school crossing." Ex. 3 at 00:30–00:44, *Garcia v. City of New Hope*, No. 0:17-cv-03574-NEB-ECW (D. Minn. Nov. 19, 2018), ECF No. 51-2(3). Officer Baker called for back up and activated her emergency lights to pull over Garcia's vehicle.

Officer Baker approached Garcia on his passenger side window. Using his phone, Garcia began to video the traffic stop and then asked Officer Baker why she pulled him over. She replied, "You drove by and you flicked me off and I'm curious as to why you did that." *Id.* at 01:07–01:11. Garcia asked if his actions were illegal, and Officer Baker replied that there was a woman with her children at the school patrol and that his actions constituted disorderly conduct.

Officer Baker then asked for Garcia's license and insurance twice, but he ignored her requests. Instead, he demanded that she call her supervisor because she was violating his First Amendment rights. Officer Baker asked Garcia for his license several more times. He replied that he would give her the license but repeatedly asked her if she was going to shoot him. Garcia then again asked for Officer Baker's supervisor, and Officer Baker asked for his license. He refused to comply and, instead, asked for her name and badge number. Officer Baker responded that her information would be on the citation.

Officers Gust and Jacobs arrived on the scene while Officer Baker was still standing at Garcia's passenger window. She then told him to get out his "g*d d**n D.L." *Id.* at 02:15–02:18. Officer Gust approached the vehicle as Officer Baker continued to ask for Garcia's license. Garcia still did not provide his license and yelled that he was "protected by the First Amendment!" Ex. 2 at 01:20–01:23, *Garcia v. City of New Hope*, No. 0:17-cv-03574-NEB-ECW (D. Minn. Nov. 19, 2018), ECF No. 51-2(2). Officer Baker walked around the vehicle to Garcia, yelling for Garcia to get out of his vehicle. She opened the driver's side door and demanded that Garcia get out of the vehicle. Officer Baker then grabbed Garcia as he stepped out of the vehicle, placed him against his vehicle, and handcuffed him. Officer Baker threw Garcia's wallet on the ground. Officer Gust helped Officer Baker hold Garcia against the vehicle. Officer Johnson also arrived during this time, but he did not assist in handcuffing Garcia.

-3-

The officers asked Garcia several times whether he had any weapons, but he invoked his Fifth Amendment right to remain silent. The officers escorted Garcia to Officer Baker's squad car. At the squad car, Garcia admitted that he had a box cutter, so Officer Gust patted him down. Officer Baker told Garcia that he was "being detained . . . right now for disorderly conduct." Ex. 3 at 03:36–03:41. Officer Gust placed Garcia in Officer Baker's squad car. After detaining Garcia, Officer Baker then recounted the events with Garcia to the officers:

> This morning, him and I got in a little—he stopped when I told him to slow down going through the crosswalk, the kids are on the school patrol. He said, "I'm only going 25." Well, it's 20. Drove by this afternoon and flicked me off. The kids are out, there's a mom there with a kid waiting at the corner . . . . He flicked me off, I got in my car . . . . Videotaping the whole time. "Don't shoot me, don't shoot me." He wants a supervisor.

*Id.* at 04:16–04:40.

Officer Baker also told the arriving officers that Garcia would not give her his license and "that's why he's taking a timeout for right now." *Id.* at 05:02–05:05. Officer Johnson related that once he saw Garcia's license plate, he realized that Garcia had raised his middle finger at him before. After talking to the other officers, Officer Baker retrieved Garcia's wallet from the ground and returned to her squad car. While in the car with Garcia, Officer Baker explained that he was being detained for disorderly conduct and for not providing her his license. Officer Baker held Garcia in the car for around seven minutes, and during that time, he continued to talk to her about how the officers were dangerous and unprofessional. Officer Baker issued Garcia a citation. Officer Gust then took Garcia out of the squad car and removed his handcuffs. As Garcia left, he yelled "f**k you" at the officers. *Id.* at 12:56–12:58. He then drove away in his vehicle.

Garcia's citation listed charges for disorderly conduct and a license plate violation.[1] Officer Baker later explained that she had never pulled someone over for giving her the middle finger. But, she explained that she pulled Garcia over because his behavior began to escalate after their first encounter. As to the license plate violation, Officer Baker noted in her incident report: "During the traffic stop, I observed the license plate having a plastic cover over the entire plate and a red plate frame obstructing the view of the month and year stickers." Ex. 1 at 38, *Garcia v. City of New Hope*, No. 0:17-cv-03574-NEB-ECW (D. Minn. Nov. 19, 2018), ECF No. 51-1. She later clarified that she noticed the license plate during the crosswalk encounter and mentioned the violation in the wrong portion of her incident report. Officer Baker also stated that she did not inform Garcia of the license plate violation because she could not have a conversation with him. Garcia denies that he had a cover or frame over his license plate.

To defend against the charges, Garcia obtained counsel. His counsel advised him that he would go to jail if he did not take a driving course and write a letter of apology. Garcia apologized in writing and took the driving course. He also entered into an "Agreement to Suspend Prosecution" ("Agreement") on April 7, 2016, pursuant to Minnesota Rule of Criminal Procedure 27.05. His charges were officially dismissed on April 7, 2017. Also on April 7, 2016, Garcia filed a complaint with the New Hope Police Department. After review, Chief of Police Tim Fournier concluded that the complaint was not sustained because the traffic stop was justified.

Garcia then filed suit in Minnesota state court against Officers Baker, Johnson, Gust, Jacobs, and the City (collectively "the defendants"). He alleged that they violated his Fourth Amendment rights and committed battery by injuring his hand

---

[1]"It is unlawful to cover any assigned letters and numbers or the name of the state of origin of a license plate with any material whatever, including any clear or colorless material that affects the plate's visibility or reflectivity." Minn. Stat. Ann. § 169.79, subdiv. 7.

when they handcuffed him. In addition, he sued Officer Baker and the City for retaliating against him for exercising his First Amendment rights and for assault and malicious prosecution. The defendants removed the case to federal court and filed a motion for summary judgment, asserting that the officers were entitled to qualified immunity on the Fourth and First Amendment claims and entitled to official immunity on the state-law claims.

The district court first considered Garcia's Fourth Amendment claim that the officers unlawfully seized him during the traffic stop. It addressed the two possible justifications offered by Officer Baker for stopping Garcia's vehicle: disorderly conduct and the license plate violation. As to the disorderly conduct, the district court explained that because Officer Baker and Garcia had conflicting accounts of the circumstances surrounding the stop, genuine issues of material fact existed as to whether Officer Baker had a reasonable suspicion to stop Garcia based on his disorderly conduct. These disputes precluded qualified immunity and thus summary judgment on the disorderly conduct justification.

The district court also considered the license plate violation as a potential justification for Officer Baker's stop of Garcia. The court noted that a traffic violation provides probable cause for a stop. Garcia disputed that his license plate was covered. But, the district court determined that even if Officer Baker made a mistake, it was a reasonable mistake. The court noted that the other officers saw the frame, the license plate was not clearly discernible on the squad car video, and Garcia entered into the Agreement instead of disputing the violation. Therefore, because Officer Baker had probable cause to pull the vehicle over, the district court held that the stop did not violate the Fourth Amendment.

As to the remaining claims, the district court first determined that the officers did not use excessive force in handcuffing Garcia because he continued to resist the officers' commands, and such resistance would give a reasonable officer reason to

believe that his safety may be in danger. Therefore, the district court granted summary judgment on the remaining Fourth Amendment claims against the officers. Moreover, the district court granted qualified immunity to Officer Baker on the First Amendment retaliation claim because Garcia failed to satisfy one of the elements of the claim: he failed to show that Officer Baker lacked reasonable suspicion or probable cause to conduct the traffic stop.

Finally, because Garcia failed to allege a constitutional violation against any of the officers, the district court dismissed Garcia's 42 U.S.C. § 1983 claim against the City. And, the district court granted the defendants official immunity on the state-law claims. Therefore, the district court granted summary judgment in favor of the defendants. Garcia appeals.

## II. *Discussion*

Garcia argues that the district court erred in granting the officers' qualified immunity motion. "Qualified immunity protects law enforcement officers from liability for civil damages so long as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known." *Perry v. Woodruff Cnty. Sheriff Dep't*, 858 F.3d 1141, 1144 (8th Cir. 2017). Thus, the officers are entitled to qualified immunity "unless: (1) [they] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation." *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019). We review the district court's grant of qualified immunity de novo, viewing the record in the light most favorable to Garcia and drawing inferences in Garcia's favor. *Williams v. Decker*, 767 F.3d 734, 738–39 (8th Cir. 2014).

## A. *Fourth Amendment Seizure*

Garcia first contends that Officer Baker was not entitled to qualified immunity on his Fourth Amendment claim because she unlawfully stopped his vehicle. The

Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Because a traffic stop is a seizure under the Fourth Amendment, it "must be supported by reasonable suspicion or probable cause." *United States v. Hollins*, 685 F.3d 703, 705–06 (8th Cir. 2012) (internal quotation omitted).

Officer Baker provided two justifications for the stop: (1) disorderly conduct and (2) the license plate violation. During the stop, Officer Baker emphasized Garcia's alleged disorderly conduct, including stating that she stopped him because he "flicked [her] off." Ex. 3 at 01:07–01:11. The district court declined to grant qualified immunity to Officer Baker on the disorderly conduct violation, and Officer Baker does not challenge the district court's conclusion.[2] Therefore, our analysis focuses solely on Officer Baker's second justification for stopping Garcia: the license plate violation.

"A traffic stop is constitutionally reasonable where the police have probable cause to believe that a traffic violation has occurred." *De La Rosa v. White*, 852 F.3d 740, 743 (8th Cir. 2017) (internal quotation omitted). Explained another way, "any traffic violation, even a minor one, gives an officer probable cause to stop the violator," and therefore, "any ulterior motivation on the officer's part is irrelevant." *Johnson v. Crooks*, 326 F.3d 995, 998 (8th Cir. 2003) (internal quotation omitted). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the officer at the time." *United States v. Demilia*, 771 F.3d 1051, 1054 (8th Cir. 2014) (cleaned up).

---

[2]The defendants state that "there is no need for this [c]ourt to address" whether Officer Baker had reasonable suspicion or probable cause to pull Garcia over for disorderly conduct. Appellees' Br. at 11–12. "Claims not raised in an initial brief are waived . . . ." *Mahaney v. Warren Cnty.*, 206 F.3d 770, 771 n.2 (8th Cir. 2000) (per curiam).

Under Minnesota law, "[i]t is unlawful to cover any assigned letters and numbers or the name of the state of origin of a license plate with any material whatever, including any clear or colorless material that affects the plate's visibility or reflectivity." Minn. Stat. Ann. § 169.79, subdiv. 7. Officer Baker alleges that the license plate was covered and had a "red plate frame obstructing the view of the month and year stickers." Ex. 1 at 38. If Garcia's license plate was covered, he committed a traffic violation, and Officer Baker had probable cause to stop Garcia.

However, Garcia avers that Officer Baker's reliance on the traffic violation "is meritless because [he] denies that his license plate was covered with an illegal cover or frame during the subject incident." Appellant's Br. at 16. In response, Officer Baker provides video evidence in an attempt to show that Garcia's license plate was illegally covered. As the Supreme Court explained, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

We cannot say that Garcia's contention that his license plate was not covered is "blatantly contradicted by the record." *See id.* "Having reviewed the evidence ourselves, we deem it inconclusive." *Johnson v. McCarver*, 942 F.3d 405, 412 (8th Cir. 2019). At oral argument, Officer Baker's counsel pointed to the time frame where the video most clearly shows Garcia's license plate. *See* Ex. 3 at 02:56. But, even at that moment, the video remains too blurry to establish whether Garcia's license plate was covered. "Accordingly, we conclude that this is one of those usual qualified immunity cases in which viewing the facts in the light most favorable to the nonmovant means adopting the plaintiff's version of the facts." *Michael v. Trevena*,

899 F.3d 528, 532 (8th Cir. 2018) (cleaned up). Viewing the record in the light most favorable to Garcia, we assume that Garcia's license plate was not unlawfully covered.[3]

However, our analysis does not end here. Officer Baker argues that even if we assume that Garcia's license plate was not covered, she is still entitled to qualified immunity because her belief that the license plate was covered was objectively reasonable. "[Q]ualified immunity does not depend on whether [Garcia's license plate] was *in fact* [covered]; rather, the key is [Officer Baker's] *objectively reasonable beliefs* under the circumstances." *Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017). As our circuit has explained, an officer does not violate the Fourth Amendment—and therefore is entitled to qualified immunity—if she "act[s] upon a mistake of fact that is objectively reasonable." *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011).

In *Williams*, the officer conducted an investigatory stop because he had a reasonable suspicion that one of the plaintiffs was operating a vehicle while intoxicated. 767 F.3d at 739–40. The plaintiffs alleged that the officer violated their Fourth Amendment rights and insisted that a genuine dispute of material fact precluded qualified immunity. *Id.* at 740. The officer reported that he saw the driver

---

[3]We have explained that a dispute over a traffic violation may not be material where the officer "briefly questions the motorist about what occurred, and lets the motorist depart without issuing a citation or expanding the investigation beyond the question of a traffic violation." *Johnson*, 326 F.3d at 998–99. But, here, the traffic stop led to Officer Baker extensively questioning Garcia, handcuffing Garcia, and issuing Garcia a citation. Therefore, whether Garcia committed a traffic violation is material. *See Huff v. Reichert*, 744 F.3d 999, 1003–05 (7th Cir. 2014) (finding that the dispute over whether or not the driver changed lanes without a signal was material and denying an officer qualified immunity on the plaintiff's unreasonable seizure claim where the officer detained the plaintiffs and searched the vehicle).

-10-

drink from a paper bag containing alcohol, but the plaintiffs averred that the alcohol was in the back seat. *Id.* However, we explained that even if the officer was mistaken, his perception was objectively reasonable based on the totality of the circumstances—alcohol "was being consumed in close proximity" of the driver, the plaintiffs made furtive movements as the officers approached the vehicle, and "the vehicle was parked at an angle across two parking spaces." *Id.* at 739–40.

Similar to *Williams*, Officer Baker contends that the totality of the circumstances surrounding Garcia's traffic stop also shows that any mistaken perception of the license plate was objectively reasonable. Officer Baker asserts the same reasons that the district court relied upon: Officers Baker and Jacobs both testified that they saw the cover with a frame on the license plate, Officer Baker's squad vehicle shows the license plate even if it "is not clearly discern[i]ble," and Garcia chose to enter into the Agreement rather than dispute the citation. *Garcia v. City of New Hope*, No. 17-CV-03574, 2019 WL 1237122, at *6 (D. Minn. Mar. 18, 2019).

First, Officer Jacobs's testimony that she saw the cover with a frame on the license plate adds little to the mistake-of-fact analysis. "The issue is whether the totality of the circumstances *at the time of the stop* supports the reasonableness of the officer's belief . . . ." *United States v. Gaffney*, 789 F.3d 866, 869 (8th Cir. 2015) (emphasis added) (finding officer's mistake of fact that the driver was speeding objectively reasonable when the officer knew the area, saw the driver brake hard after following him, and thought the driver was speeding). Officer Jacobs's testimony provides nothing to the analysis of Officer Baker's perception of the license plate at the time she stopped Garcia.[4]

---

[4]There is also a dispute of fact as to *when* Officer Baker noticed the alleged license plate violation. In Officer Baker's report, she noted that she observed the license plate "[d]uring the traffic stop." Ex. 1 at 38. Although she later corrected

-11-

Additionally, the blurriness of the video makes it unhelpful to Officer Baker. It is true that we have found that an officer made a reasonable mistake about a license plate violation where the license plate was not centered on the front bumper and "it was dark outside, making it difficult for [the officer] to fully scan the vehicle for a front license plate." *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008). But the blurry video does not show that Officer Baker's view of the license plate was hindered. In fact, the video depicts a clear day and shows that Officer Baker—who was right behind Garcia's car—had a clear view of the license plate. Officer Jacobs's testimony and the blurry video are not enough to show that Officer Baker had an objectively reasonable belief—based on the totality of the circumstances—that the license plate was unlawfully covered.

However, Officer Baker's last justification for the license plate violation—that Garcia did not contest the citation—deserves further attention. Our circuit has explained that a fact of conviction is enough to defeat a § 1983 claim that a plaintiff was arrested without probable cause. *Malady v. Crunk*, 902 F.2d 10, 11–12 (8th Cir. 1990). And, in *Carrick v. Freeman*, we held that a plaintiff could not bring a § 1983 claim alleging he was stopped and arrested without probable cause because he "was charged and convicted in state court for obstruction, resisting arrest, and improper license plate display." 709 F. App'x 409, 410 (8th Cir. 2018) (per curiam). The fact that the plaintiff's charges were later nolle prossed did not change this analysis. *Id.*

Here, Garcia entered into the Agreement, pursuant to Minnesota Rule of Criminal Procedure 27.05. The rule explains that "[a] prosecution may be suspended

---

herself to say she meant to say the morning stop, a reasonable jury could read her police report to say that she did not see the license plate until during the second stop in the afternoon. And, probable cause is based on an officer's observations "at the time of the stop," not observations after the stop has been initiated. *Gaffney*, 789 F.3d at 869.

for a specified time and then dismissed . . . if" (1) there is a written agreement signed by the parties, (2) "the victim's views are considered," (3) "the court consents," and (4) "the court finds a substantial likelihood of conviction and that the benefits of rehabilitation outweigh the harm to society from suspending prosecution." Minn. R. Crim. P. 27.05, subdiv. 1. Once the suspension period expires, the charge must be dismissed, and "the defendant cannot be prosecuted for it." *Id.*, subdiv. 6.

Does a court finding of a "substantial likelihood of conviction" have the same or similar effect of an actual conviction resulting as an admission that there was probable cause? We think not. Minnesota case law explains that in a continuance for dismissal, "[t]he district court does not make a finding of guilt, and the defendant does not make an admission of guilt." *State v. Strok*, 786 N.W.2d 297, 300 (Minn. Ct. App. 2010) (internal quotation omitted). Further, the Agreement did not require Garcia to stipulate to any facts regarding his charges even though the Agreement provides an area to do so. Because the Agreement does not require an admission of guilt or a finding of guilt, it is distinguishable from a conviction. The Agreement alone does not defeat Garcia's claim that Officer Baker stopped his vehicle without probable cause.

In sum, the record contains a blurry and thus unhelpful video, the officers' testimony that the license plate was unlawfully covered, and Garcia's testimony that it was not covered. The fact of the visibility of the license plate is genuinely disputed. "We have stated that disputed factual issues and conflicting testimony should not be resolved by the district court at the summary judgment stage." *Henderson v. City of Woodbury*, 909 F.3d 933, 940 (8th Cir. 2018) (cleaned up).

Further "[w]hich story is more plausible we cannot say because it is not our function to remove the credibility assessment from the jury." *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1211 (8th Cir. 2013) (internal quotation omitted)

(reversing the district court's conclusion that the plaintiff's Fourth Amendment claim did not present a genuine dispute of material fact because—depending on who the jury decided to credit—it could reasonably find that the police officer was either "an overzealous police officer who, without identifying himself as a law enforcement official, used excessive force" or could find that the officer "was a responsible professional who reasonably thought it necessary to use force against [the plaintiff] to defuse a potentially dangerous dispute").

Therefore, at this stage of the litigation, Officer Baker is not entitled qualified immunity based on the absence of a Fourth Amendment violation because there is a genuine dispute of material fact as to whether she had probable cause to conduct a traffic stop of Garcia's vehicle. *See Coker v. Ark. State Police*, 734 F.3d 838, 843 (8th Cir. 2013) (reversing a grant of summary judgment because "[w]ithout the aid of video or an understandable audio recording, it is impossible to determine what happened . . . without weighing [the officer's] version of [the facts] against [the plaintiff's] story"); *see also Trevena*, 899 F.3d at 533–34 (finding a genuinely disputed material fact precluded summary judgment on an unlawful arrest claim because the recordings were inconclusive and a jury could reasonably adopt either the officers' or the plaintiff's version of the facts).

In addition, the defendants do not dispute that Garcia's Fourth Amendment right to be free from unreasonable seizure was clearly established at the time of the traffic stop. "At the time of [Garcia's] stop, the law clearly established that a traffic stop must be supported by reasonable suspicion." *Duffie v. City of Lincoln*, 834 F.3d 877, 884 (8th Cir. 2016) (finding clearly established prong satisfied where officers conducted a traffic stop even though the plaintiff did not violate a traffic law). Because (1) there is a genuine dispute of material fact as to whether Officer Baker violated Garcia's Fourth Amendment right to be free from an unreasonable seizure and (2) the right is clearly established, Officer Baker is not entitled to qualified

-14-

immunity. Therefore, we reverse the district court's grant of qualified immunity to Officer Baker on the Fourth Amendment seizure claim.[5]

### B. *Fourth Amendment Excessive Force*

Garcia next claims that the officers used excessive force when handcuffing him. In deciding whether the use of force was excessive, "we consider whether it was objectively reasonable under the circumstances, relying on the perspective of a reasonable officer present at the scene rather than the 20/20 vision of hindsight." *Perry*, 858 F.3d at 1145 (cleaned up). This analysis "requires careful attention to the facts and circumstances of each particular case" and focuses on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Garcia argues that the use of handcuffs was objectively unreasonable because he did not commit any crimes, was not a threat to the officers' safety, and did not resist arrest. It is well-established that an investigatory stop includes the right for an officer "to use some degree of physical force or threat to effect the stop." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011). "The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances." *Id.* (internal quotation omitted). Thus, although an officer may use handcuffs to protect the officers and maintain the status quo during the stop, the use

---

[5]To the extent that Garcia attempts to argue that the other officers also violated his Fourth Amendment right to be free from an unreasonable seizure, the district court correctly held that they are entitled to qualified immunity. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1010 (8th Cir. 2017) ("Generally, an assisting officer is entitled to rely on the probable cause determination of the arresting officer and may receive qualified immunity as long as the reliance is reasonable."). Nothing in the record indicates that the officers' reliance on Officer Baker's reasoning for conducting a traffic stop was unreasonable.

of handcuffs "requires the officer to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* (cleaned up).

Garcia compares his case to *El-Ghazzawy*. In that case, we held that the use of handcuffs within seconds of encountering the plaintiff was objectively unreasonable because there was nothing in the dispatch to indicate the suspect was armed or dangerous. *Id.* at 455, 457. In addition, the plaintiff was "calm and cooperative during the entirety of the incident." *Id.* at 458. But, this case is distinguishable from *El-Ghazzawy*. It is undisputed that Garcia refused to comply with Officer Baker's multiple demands for license and insurance, refused to get out of his vehicle despite being asked by Officer Baker, and was verbally combative from the beginning of the stop.

An officer may use some force when a suspect fails to comply with demands. *See Wertish v. Krueger*, 433 F.3d 1062, 1066 (8th Cir. 2006). In *Wertish*, we held that it was reasonable for an officer to handcuff the plaintiff after the plaintiff had been driving erratically and refused to get out of his truck after the officer pulled him over. *Id.* And, in *Foster v. Metropolitan Airports Commission*, we concluded that an officer's use of force to pull a suspect from his car and handcuff him was reasonable after the suspect resisted the request to get out of a vehicle. 914 F.2d 1076, 1082 (8th Cir. 1990).

Similar to *Wertish* and *Foster*, Officer Baker did not use excessive force in pulling Garcia out of his vehicle and handcuffing him. Despite Officer Baker's multiple requests for license and insurance, Garcia continued to ignore the requests. Instead, he continued to argue with Officer Baker about the traffic stop. As Officer Baker repeatedly asked for his license, Garcia began to yell at Officer Baker and kept asking if Officer Baker planned to shoot him. And, as in *Wertish* and *Foster*, when

-16-

Officer Baker asked Garcia to step out of his vehicle, he continued to yell and did not get out of his vehicle.

Officer Baker did not violate Garcia's Fourth Amendment rights because the alleged facts do not show she used force beyond what was reasonable for the circumstances. Therefore, the district court properly granted her qualified immunity on Garcia's excessive force claim.

Further, the other officers are also entitled to qualified immunity. Before the officers arrived, Officer Baker had requested help after having a combative encounter with Garcia. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) ("No settled Fourth Amendment principle requires [an] officer to second-guess the earlier steps already taken by his or her fellow officers . . . ."). Once the officers arrived, they witnessed Garcia yelling at Officer Baker and refusing to comply with demands. Moreover, Garcia does not allege how Officers Jacobs and Johnson violated his Fourth Amendment right to be free from excessive force.

Garcia does allege that Officer Gust used excessive force in assisting Officer Baker in handcuffing and detaining him. However, Officer Gust had the same lawful reasons as Officer Baker to remove Garcia from his vehicle to have him handcuffed. *See Wertish*, 433 F.3d at 1066. And, it was reasonable for Officer Gust to perform a pat-down given that Garcia would not answer if he had any weapons and only later admitted that he had a box cutter. *Gaffney*, 789 F.3d at 870 ("A pat-down is permissible if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (cleaned up)).

Based on the totality of the circumstances, the officers' use of force in handcuffing Garcia was objectively reasonable. Therefore, the officers did not violate

Garcia's Fourth Amendment right to be free from excessive force, and the district court did not err in granting the officers qualified immunity on Garcia's excessive force claim.

### C. *First Amendment Retaliation*

Next, Garcia contends that Officer Baker retaliated against him for exercising his First Amendment right when she pulled him over after he gave her the middle finger. To establish a First Amendment retaliation claim under § 1983, Garcia must satisfy the following four prong analysis:

> (1) [Garcia] engaged in a protected activity; (2) [Officer Baker] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; (3) the adverse action was motivated at least in part by [Garcia's] exercise of the protected activity; and (4) lack of probable cause or arguable probable cause.

*Thurairajah*, 925 F.3d at 984–85 (internal quotation omitted).

First, Garcia's raising his middle finger at Officer Baker is a rude and offensive gesture but nonetheless, under current precedent, is a constitutionally protected speech activity. *See Cruise-Gulyas v. Minard*, 918 F.3d 494, 497 (6th Cir. 2019) ("Any reasonable officer would know that a citizen who raises [his] middle finger engages in speech protected by the First Amendment."); *see also Thurairajah*, 925 F.3d at 982, 985. As the Supreme Court has explained, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). And, in *Cohen v. California*, the Court held that the First Amendment protected a defendant's right to wear a jacket with the words "F**k the Draft" in a courthouse where women and children were present. 403 U.S. 15, 16, 25–26 (1971).

As to the second prong, Officer Baker's stopping Garcia, detaining him in a police car, and issuing him a citation would chill an ordinary person from continuing the activity. *See Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (finding that there was a question of fact as to whether receiving multiple parking tickets would impermissibly chill activity); *see also Hoyland v. McMenomy*, 869 F.3d 644, 657 (8th Cir. 2017) ("[T]here can be little doubt that being arrested for exercising the right to free speech would chill a person of ordinary firmness from exercising that right in the future." (internal quotation omitted)). Further, although "how plaintiff acted might be evidence of what a reasonable person would have done," "[t]he question is not whether the plaintiff [him]self was deterred." *Garcia*, 348 F.3d at 729. Garcia continued to criticize Officer Baker throughout the encounter, but the prong "is an objective one, not subjective." *Id.* A jury could reasonably find that an ordinary person would have been deterred after being stopped by a police officer, being handcuffed, and receiving a citation.

"Under the third prong, a plaintiff must show that the retaliatory motive was a substantial factor or but-for cause of the adverse action." *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (internal quotations omitted). As the district court explained, although Officer Baker stated that she never pulled someone over solely for giving her the middle finger, her statements during the traffic stop could suggest otherwise. In response to Garcia's asking why she pulled him over, Officer Baker stated, "You drove by and you flicked me off and I'm curious as to why you did that." Ex. 3 at 01:07–01:11. A reasonable jury could find that Officer Baker was motivated to conduct a traffic stop of Garcia's vehicle because he gestured at her with his middle finger. *See Thurairajah*, 925 F.3d at 985 (explaining that an officer's affidavit suggested that "the arrest was motivated, at least in part, by the [First Amendment speech]").

Finally, probable cause or arguable probable cause is fatal to a First Amendment retaliation claim. *Galarnyk v. Fraser*, 687 F.3d 1070, 1076 (8th Cir. 2012). So, Garcia must show that the traffic stop was not supported by probable cause. *See id.* As previously explained, Officer Baker did not appeal the district court's conclusion that a genuine dispute of material fact precluded it from finding probable cause on the disorderly conduct citation. And, there is a genuine dispute of material fact as to whether Officer Baker had probable cause to stop Garcia for committing a license plate violation. Therefore, a reasonable jury could find that Officer Baker lacked probable cause to pull Garcia's vehicle over. All four prongs are satisfied.

In addition, Officer Baker does not dispute that Garcia's right to be free from First Amendment retaliation was clearly established at the time of his arrest.[6] "Criticism of law enforcement officers, even with profanity, is protected speech." *Thurairajah*, 925 F.3d at 985; *see Cruise-Gulyas*, 918 F.3d at 497 ("Any reasonable officer would know that a citizen who raises [his] middle finger engages in speech protected by the First Amendment."); *see also Cohen*, 403 U.S. at 25–26.

Based upon the record before us, we hold that the district court erred in granting qualified immunity to Officer Baker on Garcia's First Amendment retaliation claim.

### D. *Municipal Liability*

Garcia argues that the City should be liable under § 1983 because it failed to adequately train its officers on the concept of disorderly conduct and fighting words.

---

[6]Taking the facts in the light most favorable to Garcia, we base our analysis on Garcia's testimony that Officer Baker pulled him over because he raised his middle finger at her and that there were no children present. Ex. 1 at 11–12.

"[A] municipality cannot be held liable on a *respondeat superior* theory," or simply because it employs an officer who committed a § 1983 violation. *Atkinson*, 709 F.3d at 1214 (internal quotation omitted). However, liability for the officer's violation may attach to the City "if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise" the officer. *Id.* (cleaned up). Of the three types, a municipality's liability "is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

A failure to train claim requires evidence that "the municipality received notice of a pattern of unconstitutional acts committed by its employees." *Atkinson*, 709 F.3d at 1216–17 (cleaned up). Accordingly, the claim fails when the plaintiff presents "no evidence indicating the city had reason to believe, before the events giving rise to th[e] case, that its training or supervision of [the officers] was inadequate." *Id.* at 1217. Other than the event at issue here, Garcia cites to no facts that would have given the City notice of a potential training inadequacy. Without notice, the City had no reason to believe its officer training was deficient to the point of risking constitutional injury to persons. Therefore, the district court properly granted summary judgment to the City.

### E. *State-Law Claims*

Finally, Garcia argues that the district court erred in granting the defendants' official immunity on his state-law claims of assault, battery, and malicious prosecution. "The common law doctrine of official immunity provides that a public official who is charged by law with duties calling for the exercise of judgment or discretion is not personally liable to an individual for damages unless the official is guilty of a willful or malicious act." *Huttner v. State*, 637 N.W.2d 278, 284 (Minn. Ct. App. 2001) (internal quotation omitted). In deciding whether official immunity is available, we consider "(1) whether the alleged acts are discretionary or ministerial;

and (2) whether the alleged acts, even though of the type covered by official immunity, were malicious or willful and therefore stripped of the immunity's protection." *Dokman v. Cnty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001).

First, the officers' actions were discretionary. While "[a] ministerial act involves merely the execution of a specific, absolute duty," a discretionary act requires an official to use judgment or discretion. *Id.* The Minnesota Supreme Court has explained that police officers' actions in responding to dispatch or making an arrest are "precisely the type of discretionary decisions, often split-second and on meager information, that we intended to protect from judicial second-guessing through the doctrine of official immunity." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 665 (Minn. 1999).

Second, Garcia has presented no information to show that the officers acted with malice. "Malice is defined as the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Dokman*, 637 N.W.2d at 296 (internal quotation omitted). In *Dokman*, the plaintiff failed to show malice because there was no factual basis to support the claim that officers shot at him because they were angry. *Id.* at 297. Similarly, Garcia stated that Officer Baker pulled him over because she was curious as to why he flicked her off. However, Officer Baker believed—perhaps mistakenly—that Garcia had committed disorderly conduct, and Garcia provides no evidence of malice. Further, Garcia cites no evidence as to how the other officers acted in malice.

Therefore, the district court correctly dismissed the state-law claims against the officers based on official immunity. "Because the officers' discretionary actions are entitled to official immunity, the City has no vicarious liability." *Hayek v. City of St.*

*Paul*, 488 F.3d 1049, 1057 (8th Cir. 2007). The district court properly granted summary judgment to the defendants on Garcia's state-law claims.

### III. *Conclusion*

Accordingly, we affirm the district court's grant of qualified immunity to the officers on the excessive force claim, grant of summary judgment in favor of the City, and grant of official immunity to the officers on the state-law claims. We reverse the district court's grant of qualified immunity to Officer Baker on the Fourth Amendment seizure claim and the First Amendment retaliation claim and remand for further proceedings consistent with this opinion.

SHEPHERD, Circuit Judge, concurring in part and dissenting in part.

I join the majority's opinion in all respects except its conclusion that Officer Baker is not entitled to qualified immunity on Garcia's First Amendment retaliation claim. Because I conclude that Garcia has not shown a violation of a clearly established constitutional right, I would affirm the district court's grant of qualified immunity on this claim.

Garcia has not shown that his conduct, which included an offensive gesture was, as a matter of law, protected speech. See Thurairajah v. City of Fort Smith, 925 F.3d 979, 984 (8th Cir. 2019) (providing the first element of a First Amendment retaliation claim: that the plaintiff engaged in protected activity). Although critical or offensive speech may be protected by the First Amendment, see City of Houston v. Hill, 482 U.S. 451, 461-63 (1987), this right is not absolute. Indeed, the Supreme Court has held that "'fighting' words," which are those words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace," are not protected by the First Amendment. Chaplinksy v. New Hampshire, 315 U.S. 568, 572 (1942). In the context of speech directed toward law enforcement officers, critical

-23-

speech is generally afforded more protection. While "a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words,'" there are still limits to the speech an individual may hurl at an officer. See Lewis v. City of New Orleans, 415 U.S. 130, 135 (1974) (Powell, J., concurring) (citation omitted). Speech that is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest" does not enjoy First Amendment protection, even when aimed at law enforcement officers. Hill, 482 U.S. at 461 (citation omitted).

In my view, Garcia's conduct was prolonged and goes beyond that of constitutionally protected speech. Garcia made the obscene gesture while driving through a school zone in broad daylight while a crossing guard was present. He extended his head and entire arm out of the car while raising his middle finger. Further, Garcia's aberrant and aggressive behavior, which included the obscene gesture, occurred after a previous contentious encounter that morning with Officer Baker at the same school crossing. Although an officer is expected to exercise more restraint than the average citizen in responding to offensive or critical speech, I believe the facts here demonstrate an escalation of offensive and aggressive behavior that both disrupted and interfered with Officer Baker's ability to monitor the school crossing. This impact shows that Garcia's conduct amounts to speech that "rises far above public inconvenience, annoyance, or unrest" and is not protected by the First Amendment. See Lewis, 405 U.S. at 135 (Powell, J., concurring).

Further, even if Garcia has shown the violation of a constitutional right, it was not clearly established on February 1, 2016, that driving through a school zone during school hours and in the presence of a crossing guard, leaning his entire head and arm out the window of his vehicle to raise his middle finger, all following a confrontation about Garcia's rate of speed in the same location earlier that day, was protected by the

First Amendment. The majority relies on cases are factually distinct, see Cohen v. California, 403 U.S. 15 (1971); Thurairajah, 925 F.3d at 985, or are not from this circuit, see Cruise-Gulyas v. Minard, 918 F.3d 494 (6th Cir. 2019). Although we held in Thurairajah that shouting "f**k you!" at an officer was protected speech, the Court's recognition of the clearly established right to be free from First Amendment retaliation was stated at a high level of generality and did not involve the same kind of conduct here, where Garcia demonstrated escalating aggressive and offensive behavior. See 925 F.3d at 985. Cohen similarly lacked any evidence of escalating behavior; the individual in that case engaged only in the passive action of wearing a jacket bearing the words "F**k the Draft." 403 U.S. at 16, 25-26. And although the Sixth Circuit held in Cruise-Gulyas that a reasonable officer would know raising a middle finger is protected speech, this case is of no precedential value to our Court, post-dates the incident here, and involves a single interaction between the individual and the officer, not two in one day, like Garcia. See 918 F.3d at 497. Finally, none of the cases include a scenario where the offensive speech or conduct was offered in a school zone during the school day. These cases simply do not describe the facts confronting Officer Baker.

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (citation omitted). The dispositive inquiry for this court "is 'whether the violative nature of *particular* conduct is clearly established,'" taking into account "the specific context of the case, not [considering the determination] as a broad general proposition." Id. (citations omitted). When viewed with the proper level of specificity, accounting for the specific circumstances of this incident, I cannot conclude that it was clearly established that Garcia's conduct was protected by the First Amendment.

"Rulings declaring the violation of a 'clearly established right' require careful attention, because 'qualified immunity is important to "society as a whole," and because as "an immunity from suit," qualified immunity "is effectively lost if a case is erroneously permitted to go to trial."'" Robinson v. Hawkins, 937 F.3d 1128, 1144 (8th Cir. 2019) (Colloton, J., dissenting) (citation omitted).  Given the facts of this case, I believe Garcia has failed to show a violation of a clearly established constitutional right. Accordingly, I conclude Officer Baker is entitled to qualified immunity on Garcia's First Amendment claim.

_____